UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUCINDA BURROUGHS, ) <br> ) <br> **Plaintiff,** ) <br> ) No. 17 C 5098 <br> v. ) <br> ) Chief Judge Rubén Castillo <br> COOK COUNTY CLERK and ) <br> COUNTY OF COOK, ) <br> ) <br> **Defendants.** ) | |

## MEMORANDUM OPINION & ORDER

Lucinda Burroughs ("Plaintiff") brings this action against her employer, Cook County, Illinois, and the Cook County Clerk (collectively "Defendants") alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (R. 1, Compl.) Presently before the Court is Defendants' motion for summary judgment. (R. 38, Mot.) For the reasons stated below, the motion is denied.

## FACTS[1]

The following facts are disputed unless otherwise stated. Plaintiff is an employee of the Cook County Clerk's Office ("the Clerk's Office"). (R. 45, Pl.'s Resp. to Facts ¶ 1.) The Clerk's Office is a government entity charged with various duties including administering elections and maintaining birth, marriage, and death certificates. (*Id.* ¶ 2.) Cook County ("the County") is a county government under the Illinois Constitution. (*Id.* ¶ 3.) At all relevant times, Plaintiff was

---

[1] In responding to Defendants' proposed facts, Plaintiff did not comply with Northern District of Illinois Local Rule 56.1(b)(3)(A), which requires that each response contain a "concise summary of the paragraph to which it is directed." (*See* R. 45, Pl.'s Resp. to Facts.) This has created additional work for the Court, but in the interest of justice, the Court has declined to strike this document. In the future, Plaintiff must ensure that she complies with all applicable Local Rules.

employed as a clerk within the Clerk's Office and she remains employed in that position. (*Id.* ¶ 5.) Tawanna Gill is the Cook County Clerk's Human Resources ("HR") Director. (*Id.* ¶ 6.) Connie Meyers is the Cook County Clerk's Director of the Bureau of Vital Statistics. (*Id.* ¶ 7.) Carolyn Harris was Plaintiff's immediate supervisor during part of 2016 while Plaintiff worked in the Clerk's Office in Markham, Illinois. (*Id.* ¶ 8.)

Plaintiff suffered a series of strokes prior to 2014 which have caused her certain medical complications, including difficulty with walking and balancing, and the need to use the bathroom more frequently. (R. 52, Defs.' Resp. to Facts ¶ 1.) Prior to 2016, Plaintiff submitted documentation to Gill related to her medical complications. (R. 46-1, Pl.'s Aff. ¶ 1.)

On July 6, 2016, an incident occurred in the Clerk's Office between Plaintiff and Harris. (R. 52, Defs.' Resp. to Facts ¶¶ 3-6.) Plaintiff claims that she was on her way to the bathroom shortly before lunchtime when Harris told her she had to "clock out" before using the bathroom. (*Id.* ¶ 3.) Plaintiff told Harris that she had an urgent need to use the bathroom, but Harris still insisted that she go "clock out"; Plaintiff complied, but as a result of the delay, Plaintiff claims to have urinated on herself. (*Id.* ¶¶ 4-6.) Plaintiff attests that other clerks did not have to "clock out" before using the bathroom and that she personally saw other employees coming and going from the office in Harris's presence without clocking out. (R. 46-1, Pl.'s Aff. ¶ 8.) Defendants dispute various aspects of Plaintiff's account, including who caused the delay in Plaintiff using the bathroom and whether Plaintiff actually urinated on herself. (R. 52, Defs.' Resp. to Facts ¶¶ 3-6.) There is no dispute, however, that after this incident, Plaintiff complained to the director of her department, Brenski Coleman, and was given permission to take leave for the rest of the day. (*Id.* ¶ 6.)

In a July 7, 2016, email, Plaintiff complained to Gill about the incident and accused Harris of acting inappropriately in refusing to let her go to the bathroom. (R. 45, Pl.'s Resp. to Facts ¶¶ 8-9.) Gill investigated the incident, but in conducting her investigation, she did not speak to a janitor and other witnesses who Plaintiff claims could have corroborated her account that she had urinated on herself. (R. 52, Defs.' Resp. to Facts ¶¶ 9-10.) Gill also had a mistaken understanding of where the time clock was located in the office. (*Id.* ¶ 11.) Gill felt that it was a "serious matter" for Harris to keep Plaintiff from going to the bathroom, but she did not reprimand Harris over the incident. (*Id.* ¶¶ 12-13.) Gill wrote Plaintiff a response to her email, dated July 18, 2016, advising her that she had concluded that Harris did not act inappropriately during this incident. (*Id.* ¶ 14; R. 40-9, Gill Letter.) Gill asked Plaintiff to provide her with any medical documentation she had relating to her "potential medical condition." (R. 52, Defs.' Resp. to Facts ¶ 14.)

In response, Plaintiff submitted a note from her doctor, dated August 17, 2016, stating that Plaintiff "[m]ay resume restricted work" as long as she was given a "consistent schedule 9-5." (R. 40-13, Aug. 2016 Medical Note.) The note stated that Plaintiff had a "condition called syncope"[2] and was going to be "evaluated further by neurology and cardiology to determine next steps." (*Id.*)

On August 22, 2016, Plaintiff had a conversation with one of her coworkers, Lenell Brandon. (R. 52, Defs.' Resp. to Facts ¶ 15.) Plaintiff claims that Brandon told her "HR" wanted her to "drop" her complaint about the bathroom incident or they would "dig up some dirt" on her and have her fired. (*Id.*) Defendants dispute that Brandon ever made this statement. (*Id.*) Plaintiff also claims that Brandon told her that Gill wanted to see her, but Defendants dispute that

---

[2] "Syncope" is "known more commonly as fainting." *Perales v. Cty. of LaSalle*, No. 15 C 10110, 2017 WL 3434229, at *2 (N.D. Ill. Aug. 10, 2017).

3

Brandon made this statement too. (*Id.*) The parties are in agreement that after the conversation with Brandon, Plaintiff went upstairs to Gill's office. (*Id.* ¶¶ 15-16.)

When Plaintiff arrived at Gill's office, Gill told Plaintiff that she had not asked to see her. (*Id.* ¶ 16.) Plaintiff's account is that Gill then "began to holler, scream, and curse" at her for over an hour, "asking her why she had filed a lawsuit or why she complained to another agency." (*Id.*) Defendants deny that Gill ever yelled or cursed at Plaintiff, and instead claim that once Plaintiff mentioned having filed a complaint with the County's human rights department about the bathroom incident, Gill told Plaintiff that "the conversation must cease" because there was an "open case." (*Id.*) Defendants claim that Plaintiff then began acting strangely by mumbling, hitting herself in the head, and stating that HR was "trying to drive [her] crazy." (*Id.*) In the midst of this outburst, Plaintiff allegedly told Gill, "I feel like walking in front of a bus." (*Id.*) Plaintiff denies hitting herself in the head or making any statement about wanting to walk in front of a bus, but she admits that she began to cry during this incident because Gill was yelling at her. (*Id.* ¶¶ 16-17.) Plaintiff claims that Gill told her that she needed to "see a shrink," but Gill denies making this statement. (*Id.*; R. 45, Pl.'s Resp. to Facts ¶ 14.) The parties agree that as a result of the conversation, Gill escorted Plaintiff to the County's Health Services Department located across the street from the Clerk's Office. (R. 45, Pl.'s Resp. to Facts ¶ 16; R. 40-11, Authorization for Medical Evaluation.) Plaintiff was examined that same day by a County doctor, Dr. J. Mankowski, who found her fit to return to work and advised her to follow up with her own doctor. (R. 45, Pl.'s Resp. to Facts ¶ 16.)

On September 1, 2016, a meeting was held in the HR department regarding Plaintiff's continued complaints about the July 2016 bathroom incident. (R. 52, Defs.' Resp. to Facts ¶ 19.) The meeting was attended by Gill, Plaintiff, Plaintiff's attorney, a County attorney, and Harris.

4

(*Id.*) Gill made clear at the meeting that "if employees need to use the bathroom, they should be allowed to do so without interference." (R. 45, Pl.'s Resp. to Facts ¶ 11.)

A few hours after this meeting, Plaintiff was directed by Gill to "clock out" and not return to the office until she had obtained a medical release from a County doctor. (R. 52, Defs.' Resp. to Facts ¶ 20.) The parties dispute the circumstances of this request. Defendants claim that the request was based on the doctor's note Plaintiff had submitted on August 18, 2016, which Gill did not receive until September 1, the day of the meeting. (*Id.*) Defendants claim that Gill was concerned that the note was ambiguous as to whether Plaintiff could work without restrictions. (*Id.*) Conversely, Plaintiff attests that she personally handed the doctor's note to Gill on August 18, 2016, and claims she had been working without incident since that date. (*Id.*) Plaintiff claims that she was not given any reason by Gill on September 1 why she had to return to see the County doctor. (*Id.*)

On September 2, 2016, Plaintiff was seen by Dr. Mankowski for "syncope-fainting," and it was noted that she would follow up with a neurologist or cardiologist. (*Id.* ¶¶ 20-21.) The parties dispute whether Dr. Mankowski cleared Plaintiff to return to work. (*Id.*) Plaintiff claims the doctor initially released her to return to work, but then a nurse came in and told the doctor that Gill wanted to speak with him; he then left the room for a brief period, came back, and told Plaintiff she had to follow up with her own doctor before she returned to work. (*Id.* ¶ 21.) Defendants dispute that Gill spoke with the doctor or that the doctor did not release Plaintiff to return to work. (*Id.*) The release form signed by Dr. Mankowski is dated September 8, 2016, several days after he saw Plaintiff. (R. 40-14, September 8, 2016, Medical Form.) It states that

5

Plaintiff could "return to work"[3] with the notation that she should be given a "consistent schedule 9-5." (*Id.*) The form also noted that Plaintiff was to be reevaluated in November 2016. (*Id.*)

Plaintiff was paid her regular salary for September 1 and September 2, and did not use any vacation, sick, or personal time for those dates. (R. 45, Pl.'s Resp. to Facts ¶ 21.) September 3 and 4 were a Saturday and Sunday, and September 5 was Labor Day. (*Id.* ¶ 22.) Plaintiff took a paid vacation day on September 6, which she had requested the year prior. (*Id.* ¶¶ 23-24.) Plaintiff requested and took a paid sick day on September 7. (*Id.* ¶ 25.) On September 8, 2016, Plaintiff returned to work and provided a medical note from her doctor which released her to return to work provided that she was given a "consistent schedule 9 to 5." (R. 52, Defs.' Resp. to Facts ¶ 25A; R. 40-3, Pl.'s Dep. Tr., Ex. 5.)

Sometime in October 2016, Plaintiff was told by Gill that she could no longer work overtime on Saturdays or Sundays due to the doctor's note she had submitted. (R. 52, Defs.' Resp. to Facts ¶ 28.) Weekend work is not considered a "normal" work shift for the Clerk's Office and it may be outside of the hours 9:00 a.m. to 5:00 p.m. (R. 45, Pl.'s Resp. to Facts ¶ 34.) Plaintiff had previously worked overtime on several occasions on Saturdays and Sundays without incident. (R. 52, Defs.' Resp. to Facts ¶ 28; R. 46-1, Pl.'s Aff. ¶ 19.) Plaintiff told Gill that there was nothing in her doctor's note that prevented her from working on Saturdays or Sundays, provided that the work was between 9:00 a.m. and 5:00 p.m., but Gill disagreed with that interpretation of the note. (R. 52, Defs.' Resp. to Facts ¶ 29.) She told Plaintiff that Plaintiff had to get a release from her doctor and the County doctor to work overtime on weekends. (*Id.*

---

[3] The form signed by Dr. Mankowski states that Plaintiff could return to work on August 18, 2016. (R. 40-14, Sept. 2016 Medical Form.) This date appears to be a scriveners' error, because it was prior to the date Dr. Mankowski examined Plaintiff and the date he signed the form. The parties do not elaborate on this discrepancy in their filings.

6

¶ 28.) Although Plaintiff was told that she could not work any overtime due to her medical note, she occasionally had to work as late as 5:20 p.m. (*Id.* ¶ 30; R. 46-1, Pl.'s Aff. ¶ 20.) Plaintiff claims that other clerks in the office were allowed to leave at exactly 5:00 p.m., although Defendants dispute this. (R. 52, Defs.' Resp. to Facts ¶ 30.)

On October 12, 2016, Plaintiff filed a charge of discrimination with the federal Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination and unlawful retaliation. (R. 40-7, EEOC Charge.) She claimed that Defendants violated her rights by "unreasonably interfering with [her] ability to use the bathroom when it was medically necessary," improperly requesting medical documentation from her, forcing her off work while she obtained an unnecessary medical release, and invading her privacy by discussing her medical condition with the County doctor. (*Id.* at 5.)

In December 2016, Plaintiff was told by Gill to see the County doctor as soon as possible to get a reevaluation because Dr. Mankowski's release had "expired." (R. 45, Pl.'s Resp. to Facts ¶ 32.) The parties are in agreement that Plaintiff was told this by Gill, but they dispute whether Dr. Mankowski's release had actually expired. In Defendants' view, the "reevaluation" date listed on the form signed by Dr. Mankowski was meant as an "expiration" on the release; Plaintiff agrees that the form listed a reevaluation date of November 17, 2016, but she does not view that as an "expiration" date, only a notation that she would be reevaluated. (*Id.*; R. 46-1, Pl.'s Aff ¶ 17.) Plaintiff saw her own doctor again on December 8, 2016, and obtained another note stating that she could continue to work her regular schedule. (R. 46-1, Pl.'s Aff. ¶ 18.) Plaintiff attests that Meyers, the Director of the Bureau of Vital Statistics, told Plaintiff her note was not sufficient and that she still had to see the County doctor. (*Id.*) Plaintiff attests that she asked Meyers to put this requirement in writing, but Meyers refused. (*Id.*)

7

On January 31, 2017, Plaintiff was disciplined by her new supervisor, Morris Torres, over an allegation that there was a $60.00 debit missing from her cash drawer. (*Id.* ¶ 31.) Plaintiff could not recall the specifics of the debit because it had occurred several days earlier; Plaintiff claims that she was denied copies of the underlying documents so she could verify the error, although Defendants dispute this. (*Id.*) A "lead worker" normally reviews a clerk's cash drawer with them at the end of the day; another employee had done this with Plaintiff on the date of the alleged error, but this person was not disciplined for any wrongdoing in connection with the missing debit. (*Id.* ¶ 32.) Plaintiff told Torres that she felt he was retaliating against her because of her lawsuit by accusing her of the error. (*Id.* ¶ 33.) She claims that Torres "threatened to inform the law department" if she mentioned the lawsuit again. (*Id.*) Defendants deny that Torres made any such a threat. (*Id.*) Plaintiff received a "verbal reprimand" as a result of this incident, which expired after one year and was removed from her personnel file after that time. (R. 45, Pl.'s Resp. to Facts ¶ 38.)

In July 2017, another incident occurred between Plaintiff and Torres, but again the parties offer differing accounts of what occurred. (R. 52, Defs.' Resp. to Facts ¶ 34.) Plaintiff claims that Torres "deliberately walked directly into [her]" and "stomped on her foot." (*Id.*) Defendants' account is that Plaintiff and Torres were "coming from opposite directions" and simply "bumped into each other." (*Id.*) They agree that Plaintiff called the Chicago Police Department to report this incident, and an officer came and investigated. (R. 45, Pl.'s Resp. to Facts ¶ 39.) Plaintiff also complained to Gill about the incident and Gill investigated. (*Id.*) Another employee, Lillian Adams, told Gill that Plaintiff and Torres had accidentally bumped into each other. (*Id.*) Gill spoke with a customer who corroborated Plaintiff's account, stating that Torres had "just turned and stomped on [Plaintiff's] foot." (R. 52, Defs.' Resp. to Facts ¶¶ 35-37.) Gill ultimately took

8

no disciplinary action against Torres. (*Id.* ¶ 34.) Plaintiff claims that when she tried to speak with Gill about the matter, Gill told her to "shut up and used profanity" toward her, although Defendants deny this. (*Id.* ¶ 37.) Neither of the two incidents with Torres are mentioned in the charge of discrimination Plaintiff filed with the EEOC. (R. 40-7, EEOC Charge; R. 45, Pl.'s Resp. to Facts ¶ 40.)

## PROCEDURAL HISTORY

In July 2017, Plaintiff filed a complaint against Defendants alleging employment discrimination. (R. 1, Compl.) In Count I, Plaintiff alleges disability discrimination in violation of the ADA. (*Id.* ¶¶ 1-21.) In Count II, Plaintiff alleges that Defendants unlawfully retaliated against her in violation of the ADA and Title VII based on her requests for accommodations, her complaints of disability discrimination, and the charge she filed with the EEOC. (*Id.* ¶¶ 1-35.) After the close of discovery, Defendants moved for summary judgment on both claims. (R. 38, Mot.) They argue that both claims fail for the same reason: Plaintiff has not established that she suffered an adverse employment action. (R. 39, Defs.' Mem. at 1-9.) Plaintiff disagrees, arguing that the "series of actions" taken against her, when "viewed cumulatively," establish an adverse employment action. (R. 44, Pl.'s Resp. at 4.) Defendants argue in reply that the "series of actions" described by Plaintiff do not establish an adverse action. (R. 51, Defs.' Reply.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

9

moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (citation and internal quotation marks omitted). In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) (citation omitted).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (citation and internal quotation marks omitted). If the movant carries this burden, the nonmovant "must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [his] favor." *Id.* (citation and internal quotation marks omitted).

Although the non-moving party is entitled to the benefit of favorable inferences, this only extends to "reasonable inferences, not every conceivable one." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014). Additionally, not all factual disputes will preclude the entry of summary judgment—only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In

10

other words, "[i]rrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." *Fenje v. Feld*, 301 F. Supp. 2d 781, 788 (N.D. Ill. 2003) (citation omitted).

The Court is not permitted to weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Instead, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson*, 477 U.S. at 249).

## ANALYSIS

### I. Disability Discrimination

Plaintiff first claims that Defendants violated her rights under the ADA by discriminating against her based on her disability. (R. 1, Compl. ¶¶ 1-21.) Defendants argue that summary judgment is appropriate on this claim because Plaintiff did not suffer an adverse employment action within the meaning of the ADA. (R. 39, Defs.' Mem. at 2-9.)

The ADA prohibits employers from discriminating against a "qualified individual" because of a disability. 42 U.S.C. § 12112(a); *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). To avoid summary judgment, an ADA plaintiff "must demonstrate a general issue of material fact as to whether she is disabled, whether she can perform the essential functions of the position and whether she has suffered an adverse employment action because of her disability." *Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 622 (7th Cir. 2012). For purposes of the present motion, Defendants do not dispute that Plaintiff is disabled or that she can perform the essential functions of her job. (*See* R. 39, Defs.' Mem. at 2.) Rather, the sole

11

issue raised by their motion is whether Plaintiff suffered an adverse employment action. (*Id.* at 2-9.)

"An adverse employment action is some quantitative or qualitative change in the terms or conditions of the plaintiff's employment that is more than a mere subjective preference." *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018) (citation, internal quotation marks, and alteration omitted).[4] "Such changes can involve the plaintiff's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Id.* (citation and alteration omitted). The Court should consider all the circumstances of a given case because an adverse employment action may be "unique to a particular situation." *Alamo v. Bliss*, 864 F.3d 541, 553 (7th Cir. 2017). "Adverse employment actions should not be defined so narrowly as to give an employer a license to discriminate." *Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007) (citation and internal quotation marks omitted). By the same token, "not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citation omitted). The adverse action requirement is meant "to distinguish meritorious cases from trivial personnel actions brought by irritable, chip-on-the-shoulder employees." *Lewis*, 496 F.3d 645 at 653 (citation, internal quotation marks, and alternations omitted).

There are many factual disputes in the record, but accepting Plaintiff's version as true and drawing all reasonable inferences in her favor, the evidence shows that Plaintiff experienced several troubling incidents related to her disability: she was prevented from using the bathroom even though she had a medical need to do so, causing her to urinate on herself and suffer

---

[4] Some of the discrimination cases cited herein were decided under Title VII rather than the ADA, but the two statutes are applied consistently. *See* 42 U.S.C. § 12117(a) ("The powers, remedies and procedures set forth in [Title VII] . . . shall be the powers, remedies, and procedures [the ADA] . . . provides.").

considerable distress and humiliation; she was told by a coworker to go see Gill, the HR director, but when she complied Gill yelled and cursed at her for more than an hour, asking her why she had complained to another agency about the bathroom incident; she was forced to undergo a medical examination by the County health department even though she had already obtained a medical release from her own doctor; she was told to "clock out" and return to see the County doctor without explanation hours after a meeting in which her complaint about the bathroom incident was discussed; she was forced to take sick leave to see her doctor even though she still had a valid medical release; she was told her medical release did not permit her to work overtime even though she had previously worked overtime on several occasions without incident; and a coworker told her that Defendants planned to "dig up some dirt" on her and have her fired if she did not drop her complaints.[5] (R. 52, Defs.' Resp. to Facts ¶¶ 3-6, 15-17, 20-21, 28-30, 32; R. 45, Pl.'s Resp. to Facts ¶¶ 12-16, 33; R. 46-1, Pl.'s Aff. ¶¶ 1-22.)

Although it presents a close question, the Court finds that Plaintiff has presented enough direct and circumstantial evidence to survive summary judgment on her disability claim. It is true

---

[5] As Defendants point out, the two incidents involving Torres are not contained in Plaintiff's EEOC charge. (R. 39, Defs.' Mem. at 7-8.) Generally, a plaintiff "cannot bring claims in a lawsuit that were not included in her EEOC charge." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) (citation omitted). However, "a plaintiff can still bring claims not included in the EEOC charge if they are like or reasonably related to the allegations of the EEOC charge and growing out of such allegations." *Id.* (citation, internal quotation marks, and alterations omitted). "To be 'like or reasonably related,' the relevant claim and the EEOC charge must, at minimum, describe the same conduct and implicate the same individuals." *Id.* (citation and internal quotation marks omitted). The Court cannot conclude that the two incidents involving Torres are "like or reasonably related" to the incidents outlined in Plaintiff's EEOC charge. Torres is not mentioned at all in the EEOC charge, and none of the incidents Plaintiff describes involve being unfairly disciplined for errors or being subjected to acts of physical violence. (R. 40-7, EEOC Charge.) Rather, they all pertain to the bathroom incident and/or Defendants' requests for additional medical documentation. (*Id.*) Plaintiff argues that these incidents were all part of a "pattern" of wrongful acts, (R. 44, Pl.'s Resp. at 12), but the Seventh Circuit has expressly rejected this type of argument. *See Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010). "Any additional alleged act of discrimination can always be fit in and become part of an overall general pattern of discrimination." *Id.* But such an argument, "if accepted, would eviscerate the general rule that each separate act of discrimination must be set out in an EEOC charge before an action can be brought." *Id.* Accordingly, the Court has not considered the two incidents involving Torres in determining whether Plaintiff has established an adverse employment action.

that Plaintiff did not suffer a termination or demotion, the traditional types of adverse employment actions, but the series of events she describes could be construed by a reasonable jury as producing a materially adverse employment action. *See Alamo*, 864 F.3d at 553-54 (concluding that employer's pattern of requesting medical notes and imposing "hurdles" on employee related to medical condition without just cause could rise to the level of an adverse employment action); *Lewis*, 496 F.3d at 654 (concluding that fact issues precluded summary judgment on issue of whether lost overtime pay constituted an adverse employment action); *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000) (observing that "conditions of employment that are designed to harass and humiliate employees . . . are actionable adverse employment actions"); *Jha v. Shulkin*, No. 14 C 9041, 2018 WL 1508528, at *6 (N.D. Ill. Mar. 27, 2018) ("An adverse action can be a single action or event, such as a discharge, or a series of lesser actions that, when considered together, create a discriminatorily hostile or abusive environment." (citation and internal quotation marks omitted)). Therefore, Defendants' request for summary judgment on this claim is denied.

## II.  Retaliation

Plaintiff's remaining claim is that Defendants unlawfully retaliated against her in violation of the ADA and Title VII based on her requests for accommodations, her complaints of disability discrimination, and the charge she filed with the EEOC. (R. 1, Compl. ¶¶ 1-35.) To prevail on a retaliation claim, Plaintiff must prove that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the two. *Koty v. DuPage County*, 900 F.3d 515, 519 (7th Cir. 2018). "Employers are forbidden from retaliating against employees who raise [discrimination] claims regardless of whether the initial

claims of discrimination are meritless." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 602 (7th Cir. 2011).[6]

In the present motion, Defendants do not dispute that Plaintiff engaged in protected activity, nor do they raise any argument about causation. (R. 39, Defs.' Mem. at 8.) Again, their sole argument is that Plaintiff's claim fails as a matter of law because she did not suffer an adverse employment action. (*Id.*)

For purposes of a retaliation claim, an action is materially adverse if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted). "What is considered adverse depends on the circumstances of each case, but examples include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities." *Koty*, 900 F.3d at 520 (citations and internal quotation marks omitted). The "category of actions" that constitutes an adverse employment action for purposes of a retaliation claim is "broader" than the type of actions that are needed to sustain a discrimination claim. *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). That is because "the challenged adverse action need not be one that affects the terms and conditions of employment," as long as it is something that would dissuade a reasonable worker from engaging in protected activity. *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016); *see also Bredemeier v. Wilkie*, No. 15 C 7514, 2018 WL 3707803, at *9 (N.D. Ill. Aug. 4, 2018) (observing that the standard for an adverse employment action is "lower" for a retaliation claim than for a claim of discrimination). Again, the Court must carefully consider all the

---

[6] The Court notes that some of the cases cited herein were decided under Title VII or the Rehabilitation Act, 29 U.S.C. § 794(d), rather than the ADA, but the anti-retaliation provisions contained in these statutes are "materially identical." *See Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir. 2003).

circumstances, because "context" is "crucial" in retaliation cases. *See Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 665 (7th Cir. 2011). When the evidence creates a close question on whether an employee suffered a materially adverse employment action, the issue is "best resolved by a jury." *Id.*

Given that the threshold for establishing an adverse employment action is even broader in the retaliation context, the Court concludes that Plaintiff has come forward with enough evidence to survive summary judgment on her retaliation claim. A reasonable jury could conclude that denying Plaintiff overtime opportunities, threatening to "dig up dirt" on her if she did not drop her complaints, and forcing her to undergo unnecessary medical examinations by the County doctor might dissuade a reasonable worker from making or pursuing a complaint about disability discrimination. *See, e.g., Benuzzi*, 647 F.3d at 665 ("A reasonable employee could be deterred from filing a discrimination complaint . . . if doing so would be followed by the (highly probable) possibility of discipline for activities he may have long forgotten[.]"); *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 420 (7th Cir. 2004) (finding evidence sufficient to defeat summary judgment on retaliation claim where plaintiff presented evidence raising an inference that his employer was "setting him up to fail" after he filed a complaint of discrimination); *Place v. Abbott Labs.*, 215 F.3d 803, 809 (7th Cir. 2000) (requiring an employee to undergo a medical examination could constitute an adverse employment action where the employer imposed the requirement on a discriminatory basis or the evidence suggests that the employee "was being singled out"); *Smith v. Ill. Dep't of Transp.*, No. 15 C 2061, 2018 WL 3753439, at *9 (N.D. Ill. Aug. 8, 2018) ("[A]n employee reasonably would be dissuaded from protesting discrimination if the punishment were denial of overtime pay."). Therefore, Defendants' motion is denied as to this claim as well.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (R. 38) is DENIED. The parties are directed to reevaluate their settlement positions in light of this opinion and to exhaust all efforts to settle this case. They shall appear for a status on October 31, 2018, at 9:45 a.m. to set a firm trial date for this lawsuit.

ENTERED: _____
**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: October 18, 2018**