# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| LUCINDA BURROUGHS, | |
| Plaintiff, | No. 17 C 5098 |
| v. | Chief Judge Rubén Castillo |
| COOK COUNTY CLERK and COUNTY OF COOK, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Lucinda Burroughs ("Plaintiff") brought this action against her employer, Cook County, Illinois, and the Cook County Clerk (collectively "Defendants"), alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). (R. 1, Compl.) The trial in this matter occurred on March 11—14, 2019. (R. 82, 83, 86, 88, Minute Entries.) Before the Court is Defendants' motion for judgment on Plaintiff's retaliation claim pursuant to Federal Rule of Civil Procedure 52. (R. 85, Defs.' Mot.) For the reasons that follow, the motion is granted.

## BACKGROUND

Plaintiff alleged in Count I of her complaint that Defendants discriminated against her in violation of the ADA both by failing to provide her a requested accommodation and for treating her disparately from her nondisabled coworkers. (R. 1, Compl. ¶¶ 1-21.) In Count II, Plaintiff alleged that Defendants unlawfully retaliated against her in violation of the ADA and Title VII based on her request for an accommodation, and her subsequent complaints of disability discrimination. (*Id.* ¶¶ 1-35.) Plaintiff's discrimination claims were tried to a jury at the same

1

time that her retaliation claims were tried to the bench. (*See* R. 82, 83, 86, Minute Entries.) Upon the close of Plaintiff's case, Defendants filed a Rule 52(c) motion for judgment on the retaliation count, which the Court took under advisement pending the remainder of the trial. (R. 85, Defs.' Mot.) After deliberation, the jury returned a verdict for Defendants on Plaintiff's discrimination claims, finding that although Plaintiff was a qualified person with a disability who had requested a reasonable accommodation, Defendants had not failed to provide one or engaged in a series of adverse employment actions against her because of her disability. (R. 89, Verdict Form.)

As to the retaliation claim, the Court now enters its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1). The findings of fact are based upon consideration of all of the admissible evidence as well as the Court's assessment of the credibility of the trial witnesses.

## FINDINGS OF FACT

1. Plaintiff has been employed by the Cook County Clerk's Office since 2008, where she currently holds the title of Clerk V. (Trial Tr. at 131-34, 313.) As a Clerk V, Plaintiff assists and communicates with customers, and operates a cash register. (*Id.* at 134.)

2. Plaintiff suffered a series of strokes prior to joining the Clerk's Office, which affected among other things her ability to balance, walk, and control her muscles. (*Id.* at 138, 203-05.)

3. The Cook County Clerk's Office knew of her previous strokes and resulting medical issues. (*Id.* at 137-149, 165-166, 330-31, 469-71; Pl.'s Ex. 2-4, 8.)

4. While employed at the Clerk's Office, Plaintiff took leaves under the Family & Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"), for stroke-related issues in 2013 and from August to December 2014. (Trial Tr. at 134-36, 210-12, 225-27, 307-08; Pl's Ex. 2-4.)

5. Both leaves were certified by Plaintiff's then-treating physicians and were processed by the then-Human Resources Director Tawanna Gill. (Trial Tr. at 135-36, 210-12, 225-27, 329-331, 431; Pl's Ex. 3, 4; Defs.' Ex. 16.)

6. Ms. Gill has worked for the Clerk's Office for nearly 28 years, and was recently promoted from Human Resources Director to Deputy Clerk of Human Resources. (Trial Tr. at 377.) As the Human Resources Director, Ms. Gill had human resources responsibilities for approximately 264 employees, and oversaw the office's provision of ADA accommodations. (*Id.* at 377-80.)

7. Plaintiff's December 2014 form authorizing her return to work was signed by her physician, Dr. Tony Hampton. (*Id.* at 225-27; Defs.' Ex. 16.) It indicated Plaintiff could return with no restrictions, and further provided that she could use a firearm and motor vehicle. (Trial Tr. at 225-27, 347-48; Defs.' Ex. 16.)

8. A Cook County doctor agreed that Plaintiff could return to work in December 2014 with no restrictions. (Trial Tr. at 381-83; Defs.' Ex. 14.)

9. Although Plaintiff typically worked at the office in downtown Chicago, Plaintiff was assigned to work at the Clerk's office in Markham on July 6, 2016, because they were short staffed. (Trial Tr. at 385, 459-60.)

10. At the Markham office, there was no set schedule for lunch breaks. (*Id.* at 461.) Instead, Markham Vital Records supervisor Catherine Harris would direct employees when to take their breaks. (*Id.* at 461.)

11. On July 6, 2016, Plaintiff was stopped by Ms. Harris while Plaintiff was on her way to use the bathroom and told to clock out for lunch. (*Id.* at 150-51, 461-62.) Although this was their first conversation about it, Ms. Harris testified that Plaintiff had already been directed

to take her lunch by lead worker Carlita Weiss but that she had answered a telephone call instead. (*Id*. at 460-62.)

12. Plaintiff told Ms. Harris that she could not wait and that she had to get to the bathroom immediately. (*Id.* at 151.) Ms. Harris instructed Plaintiff to clock out first. (*Id.* at 153, 468-69.)

13. While Plaintiff was clocking out, she accidentally urinated which caused her great humiliation and discomfort. (*Id.* at 154-155, 464, 468-69.)

14. After Plaintiff finished cleaning herself up, she returned to Ms. Harris to complain about Ms. Harris's actions. (*Id.* at 155, 463-64.)

15. Plaintiff also called the then-Director of Vital Records Brenski Coleman to complain about the incident. (*Id.* at 155, 464, 478-489.)

16. Mr. Coleman directed Plaintiff to take the rest of the day off because she was so upset. (*Id.* at 156, 479-80.)

17. The Clerk's Office has no rule that requires an employee to clock out first before using the bathroom, and employees may use the bathroom whenever they choose. (*Id.* at 171, 336-37, 477.)

18. Prior to July 6, 2016, Plaintiff had never requested an accommodation under the ADA, and had never been prevented from using the bathroom at work. (*Id.* at 272-73, 277-78, 280-81, 465.) Plaintiff testified that her supervisors had been "always accommodating," and had "never bothered [her] before about [her] medical conditions." (*Id.* at 278.)

19. On July 7, 2016, Plaintiff emailed Ms. Gill to complain about the events of the prior day. (*Id.* at 157-59, 333.)

20. Ms. Gill investigated Plaintiff's complaint by speaking with Plaintiff, Ms. Harris, Mr. Coleman, and Ms. Wise. (*Id.* at 335, 387-88, 432-34.)

21. On July 18, 2018, Plaintiff and Ms. Gill met to discuss the incident. (*Id.* at 163, 166-68.)

22. Ms. Gill also gave Plaintiff a letter in which she concluded that Ms. Harris had not acted inappropriately but that Plaintiff had done so in raising her voice in response to the directive to clock out. (*Id.* at 163-64, 388-92; Pl's Ex. 7.)

23. Ms. Gill testified that she based her conclusion on the determination that Ms. Harris had not intentionally interfered with Plaintiff's attempt to use the bathroom. (Trial Tr. at 342-346.) Although she had also mistakenly concluded that the timeclock was on the way to the bathroom when it was actually in the opposite direction, this fact did not impact Ms. Gill's analysis of what had transpired. (*Id.* at 343-44, 392.) Ms. Gill also requested documentation of any medical condition so that the Human Resources Office could assist Plaintiff. (*Id.* at 346; Pl's Ex. 7.)

24. Plaintiff disputed Ms. Gill's conclusions both at the meeting and in an email, insisting that she had been told to clock out only after she was on her way to the bathroom, that the clock was not on the way to the bathroom, and that other employees were able to come and go while on the clock without any interference or reprimand from Ms. Harris. (*Id.* at 167-171, 348-51; Pl's Ex. 9.)

25. Plaintiff's next return to work authorization was dated August 17, 2016. (Trial Tr. at 228-229; Defs.' Ex. 6.) It did not, however, provide a specific date on which Plaintiff could return to work. (Trial Tr. at 228-30.)

26. Instead, it provided that Plaintiff was unable to work from August 17, 2016 to "TBD" (or, "to be determined"), and that she "may resume restricted work as follows: Must work a consistent schedule 9-5 . . . ." (Defs.' Ex. 6.)

27. On August 22, 2016, Plaintiff had a conversation with a coworker named Lennell Brandon. (Trial Tr. at 174-76.) Plaintiff testified that Mr. Brandon told her to drop her lawsuit or "HR" would "dig up some dirt and try and fire you." (*Id.* at 175.) According to Plaintiff, when she told Mr. Brandon that she had no lawsuit, and that all she wanted was an apology, he called Ms. Gill who directed Plaintiff to come to her office. (*Id.* at 175-76.)

28. Plaintiff then went to Ms. Gill's office, believing she would get an apology for the July 2016 bathroom incident. (*Id.* at 173-75.)

29. But Ms. Gill was surprised to see Plaintiff, and denied both telling Mr. Brandon to arrange the meeting, and making any threat of retaliation. (*Id.* at 176-77, 395-99.)

30. This conversation was witnessed by Ms. Gill's administrative assistant Diondra Twine. (*Id.* at 176-77, 359-61, 395-96, 485, 487-90.) Later that day, Ms. Twine wrote notes about the exchange. (*Id.* at 494, Defs.' Ex. 4.)

31. Plaintiff complained to Ms. Gill that she had filed human rights and ethics complaints over her treatment, and that she believed she was being discriminated and retaliated against for her complaints. (Trial Tr. at 360-62; Defs.' Ex. 4.) When Ms. Gill attempted to end the conversation, Plaintiff became extremely upset. (Trial Tr. at 292-93, 396-98, 489-90.) Based on Plaintiff's statements that Ms. Gill and Ms. Twine thought were suicidal, they then accompanied her to the County doctor's office. (*Id.* at 180-182, 293-94, 362-63, 399-401, 491; Defs.' Ex. 4.)

32. The County doctor directed Plaintiff to follow up with her personal physician, and cleared her to return to work that day. (Trial Tr. at 362-63, 440; Pl's Ex. 14.) Given how late it was in the day, however, Plaintiff was permitted to go home. (Trial Tr. at 184.)

33. The next day, Ms. Gill recommended Plaintiff utilize counseling available through their Employee Assistance Program and provided her the contact information. (Trial Tr. at 404-405; Pl.'s Ex. 15.)

34. Plaintiff continued to work her regular shift without incident until September 1, 2016. (Trial Tr. at 183, 246.)

35. On August 26, 2016, Ms. Gill called a meeting in her office with Plaintiff and Ms. Harris to follow up on the July 2016 bathroom incident. (*Id.* at 406-07.) She advised Plaintiff and Ms. Harris that although a representative could attend with them, the meeting was "**NOT** a disciplinary conference." (Pl's Ex. 16 (emphasis in original); Trial Tr. at 406-07.)

36. A meeting was held in Ms. Gill's office on September 1, 2016 between Plaintiff, Ms. Harris, Ms. Gill, and others including Plaintiff's attorney. (Trial Tr. at 363-66.)

37. Later that day, Plaintiff was instructed to go home and not to return to work until her doctor had cleared her return. (*Id.* at 240, 356, 366, 416-17, 422-23.)

38. Although Plaintiff had been working pursuant to the August 17, 2016 authorization, Ms. Gill explained that she had only first seen it on September 1, 2016, and that she was confused by its statement that Plaintiff was unable to work from "8/17/2016 to TBD." (*Id.* at 419-22.)

39. On September 2, 2016, Ms. Gill emailed the County medical office expressing concern about the "TBD" reference, and asking whether Plaintiff had any medical restriction. (*Id.* at 418; Defs.' Ex. 7.)

40. Ms. Gill did not know of the authorization earlier because it had been with a supervisor who was away on vacation. (Trial Tr. 421-22.)

41. On September 7, 2016, Dr. Hampton signed another return to work form removing the "TBD" reference from his earlier note and authorizing Plaintiff's return to work effective August 18, 2016. (*Id.* at 233-235, 312-313; Defs.' Ex. 8.) As with his earlier authorization, the only restriction set out on Plaintiff's ability to work was that she maintain "a consistent schedule 9-5." (Trial Tr. at 233-235; Defs.' Ex. 8.) It also noted that Plaintiff would be further evaluated by neurology and cardiology. (Defs.' Ex. 8.)

42. Plaintiff returned to work on September 8, 2016. (Trial Tr. at 302.)

43. Plaintiff was paid for each of the work days in which she was out of work between September 1 and September 8, 2016, however she was obliged to use a sick day for one of those days. (*Id.* at 299-302, 369-71, 417-418, 425.)

44. Plaintiff's request that she be reimbursed for the sick day she had used was denied. (*Id.* at 247, 301-02, 371.)

45. In a form dated September 8, 2016, a Cook County doctor also approved Plaintiff's August 18, 2016 return to work without restrictions beyond a consistent 9-5 schedule. (Trial Tr. at 312; Pl.'s Ex. 21.) It also noted Plaintiff would be reevaluated November 17, 2016. (Pl.'s Ex. 21; Trial Tr. at 424.)

46. When the subsequent opportunity arose to work weekend overtime hours in conjunction with the 2016 election, Plaintiff was told that she could not work overtime because of her required 9-5 schedule. (Trial Tr. at 248-49, 426-28; Defs.' Ex. 11.)

47. Plaintiff was invited to provide a new authorization allowing weekend work, but she did not do so. (Trial Tr. at 427-28.)

48. In July 2017, Plaintiff reported to Ms. Gill and her union representative that a supervisor named Morris Torres stepped on her foot and knocked her into a file cabinet. (*Id.* at 254-256.) She also called the police. (*Id.* at 429.)

49. In Ms. Gill's investigation of the incident, she spoke with a customer who said he had witnessed the exchange, but a coworker who was also identified as a witness denied having observed anything. (*Id.* at 372-73, 428-29.)

50. Plaintiff testified that Ms. Gill called Plaintiff an expletive, and told her she was going to fire her. (*Id.* at 257.) Ms. Gill denied making any such statement. (*Id.* at 429.)

51. To Plaintiff's knowledge, Ms. Gill took no action against Mr. Torres. (*Id.* at 255.) Ms. Gill had no knowledge of whether Mr. Torres was ever charged with a crime. (*Id.* at 429.)

52. Plaintiff remains an employee of the Clerk's Office, and from 2014 to the present, Plaintiff was never demoted, suspended, or had her pay docked. (*Id.* at 131, 313, 467.) Similarly, Plaintiff was never punished in conjunction with the July 2016 bathroom incident. (*Id.* at 430.)

## CONCLUSIONS OF LAW

To prevail on a retaliation claim under the ADA, Plaintiff must prove that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the two. *Koty v. DuPage County*, 900 F.3d 515, 519 (7th Cir. 2018). "Employers are forbidden from retaliating against employees who raise ADA claims regardless of whether the initial claims of discrimination are meritless." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).[1] For purposes of a retaliation claim, "[a]n

---

[1] The Court relies on authorities under the ADA as well as Title VII given that retaliation provisions of the "principal federal employment discrimination statutes are materially identical." *Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir. 2003) (citing Title VII, 42 U.S.C. § 2000e–3(a); the Age Discrimination in Employment Act, 29 U.S.C. § 623(d); the Rehabilitation Act, 29 U.S.C. § 794(d); and the ADA, 42 U.S.C. § 12203(a)).

action is materially adverse if a reasonable employee would be dissuaded from engaging in the protected activity." *Koty*, 900 F.3d at 520 (internal quotation omitted). "What is considered adverse depends on the circumstances of each case, but examples include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, and significantly diminished material responsibilities." *Id.* (internal quotation and citation omitted). The "category of actions" that constitute an adverse employment action for purposes of a retaliation claim is "broader" than the type of actions that are needed to sustain a discrimination claim. *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). Nevertheless, the challenged adverse action must be more than simply stressful to the employee; "[f]ederal law protects an employee only from retaliation that produces an injury[.]" *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (internal quotation omitted) (threat of unspecified disciplinary action without any impact on compensation, career prospects, or conditions of employment not materially adverse).

Based on the evidence presented at trial, the Court finds that Plaintiff has proven by a preponderance of the evidence that she engaged in protected activity both by requesting an accommodation and later complaining about what she perceived as disability discrimination. *See Dickerson*, 657 F.3d at 602; *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814-15 (7th Cir. 2015) (noting that statutorily protected activity includes seeking an accommodation). The testimony at trial demonstrated that Plaintiff requested a bathroom accommodation during her exchange with Ms. Harris on July 6, 2016, and that she subsequently complained about the interaction and what she perceived to be disability discrimination. (Trial Tr. at 150-161, 167-71, 333-35, 348-51, 461-69, 478-89.) Accordingly, she established the first prong of her retaliation claim. *See Preddie*, 799 F.3d at 814-15.

Plaintiff has not shown by a preponderance of the evidence, however, that she suffered a materially adverse action as a result of her protected request or complaints. *See Koty*, 900 F.3d at 519. Plaintiff argued that Defendants retaliated against her through a series of actions including: a co-worker conveying a threat of termination; requiring her to take off of work for several days until she could obtain an updated doctor's note despite having already worked under a previous one; requiring her to use a sick day in order to be paid for one of the days she was off of work; denying her request to work weekend overtime despite her previous overtime work on the stated reason that her required 9-5 schedule did not allow it; requiring her to work longer than other coworkers on a shift; a supervisor's physical assault on her a year after the bathroom incident; and the lack of consequences following her complaints about the shift work or assault.

To establish causation, Plaintiff's burden was to demonstrate that "but for" her protected activity, the acts she complains of would not have occurred. *See Rowlands v. United Parcel Serv.*, 901 F.3d 792, 801-02 (7th Cir. 2018) (discussing causal element of retaliation claim). Whether the complained of acts are viewed independently or cumulatively as she argues, Plaintiff fails to make the requisite showing. At trial, Ms. Gill testified that when she first saw Plaintiff's return to work authorization on September 1, 2016, she questioned whether it had authorized Plaintiff's return because it declared Plaintiff was unable to work "from 8/17/2016 TBD," and that she had sent Plaintiff home for this reason. (Trial Tr. at 419-22.) The email Ms. Gill wrote to the County medical office on September 2, 2016 expressing her concern supports this testimony. (Defs.' Ex. 7.) Plaintiff argued that Ms. Gill knew that Plaintiff was able to work and that this action was retaliatory, but Plaintiff's own physician Dr. Hampton testified that his August 17, 2016 letter had not included a return to work date. (Trial Tr. at 228-30.) The Court credits this testimony, and concludes that Plaintiff has not established that the directive to remain

11

out of work until she obtained a note authorizing her return was not because of her prior protected activity. Without an authorized return to work date, the required use of a sick day to obtain pay while not at work similarly fails to demonstrate retaliation.

Likewise, Plaintiff did not establish that her denied request to work weekend overtime was a result of her protected activity. The evidence does not demonstrate Defendants' denial was for any reason other than the one her employer provided, namely, Plaintiff's 9-5 work restriction. (Trial Tr. at 248-49, 426-28; Defs.' Ex. 11.) Ms. Gill testified that based on the regular hours of the Clerk's Office, she understood Plaintiff's restricted 9-5 schedule to disqualify her from evening or weekend work. (Trial Tr. at 236-27.) Her contemporaneous letter to Plaintiff explaining this understanding and asking for a release from her doctor to work additional hours supports this testimony. (Defs.' Ex. 11.) "It is the employer's prerogative to choose a reasonable accommodation," *Jay v. Intermet Wagner, Inc.,* 233 F.3d 1014, 1017 (7th Cir. 2000), and the Defendants' decision to accommodate Plaintiff's request in a way other than what she had requested does not establish an adverse employment action. *See Hancock v. Potter*, 531 F.3d 474, 478-79 (7th Cir. 2009) (no adverse action where reduction in hours resulted from employer's effort to ensure plaintiff did not work beyond her restrictions).

As to Plaintiff's claim that she was required to work longer than her coworkers, Plaintiff presented no evidence at trial to suggest that even if this were the case, the distinction was because of her protected activity. Instead, Plaintiff testified only that on certain occasions she was made to stay in the office longer than her coworkers in order to reconcile her register. (Trial Tr. 249-52.) Without evidence of any causal connection to her protected activity, this too fails to support her claim.

Turning to Plaintiff's exchange with Mr. Brandon in which she says he told her that Defendants would fire her, Plaintiff failed to demonstrate that Defendants knew about the conversation let alone that they had orchestrated it. Both Plaintiff and Ms. Gill testified similarly about their exchange that day, and the testimony does not establish that Ms. Gill (or any other supervisor) directed Mr. Brandon to make such statements or had knowledge of them until Plaintiff reported them to her. (Trial Tr. at 176-77, 395-99.) Although a threat of termination can surely be stressful and might rise to an actionable level, in this instance it does not support the claim of retaliation. *See Poullard*, 829 F.3d at 856.

Similarly, Plaintiff failed to establish that her interaction with Mr. Torres a year after the bathroom incident was related to her protected activity. First, no evidence demonstrated that he even knew of her accommodation request or subsequent complaints, let alone that his actions were taken in retaliation to them. *See Cervantes v. Ardagh Group*, 914 F.3d 560, 566-67 (7th Cir. 2019) (retaliation claim fails without evidence that supervisors were aware of complaint). Likewise, Plaintiff failed to demonstrate that any deficiencies in Defendants' response to the incident was a result of her protected activity. (Trial Tr. at 255-57, 428-29.)

In sum, while the Court does not doubt that the July 2016 incident caused Plaintiff a great deal of dismay and tension in the workplace, she has not shown by a preponderance of the evidence that Defendants' complained of actions were in retaliation to her accommodation request or related complaints. Accordingly, Plaintiff's ADA retaliation claim fails.

Finally, Plaintiff's Title VII retaliation claim fails as a matter of law. Although Title VII protects against discrimination based on certain characteristics, disability is not one of them. *See* 42 U.S.C. § 2000e-2(a)(2); *see also Lane v. Potter*, 699 F. Supp. 2d 358, 362 (D. Mass. 2010)

(dismissing retaliation claim on basis that Title VII does not prohibit discrimination on the basis of disability).

## CONCLUSION

The Court believes that the defendants need to have more positive and constructive interactions with Ms. Burroughs which encourage her desire to serve the public. Despite the strong advocacy of her counsel, the Court is left with no choice in this matter. The Court concludes this judgment is consistent with the jury's careful verdict. For all of the reasons discussed, Defendants' motion for judgment on Plaintiff's retaliation claim is (R. 85) is GRANTED. Pursuant to Federal Rule of Civil Procedure 54(b), the Clerk of Court is directed to enter final judgment in favor of Defendants on Plaintiff's retaliation claim.

ENTERED: *[signature]*
**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: March 22, 2019**